UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SCOTT KIMBLE, individually, and on                    No. 23 Civ. 6399
behalf of others similarly situated,

                        Plaintiffs,          **COLLECTIVE ACTION
COMPLAINT**

     -against-

OPTEON APPRAISAL, INC.
                      Defendant.
-------------------------------------------------------X

Plaintiff Scott Kimble ("Kimble" or "Plaintiff"), on behalf of himself and all others

similarly situated, alleges as follows:

### NATURE OF THE ACTION:

1.     Plaintiff alleges on behalf of himself and other similarly situated Real Estate Staff

Appraisers who worked for the Defendant throughout the United States and who elect to opt into

this action pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), that they are

entitled to: (i) declaratory and injunctive relief; (ii) unpaid overtime wages from Defendant for

their work; (iii) liquidated damages pursuant to the Fair Labor Standards Act ("FLSA") and, (iv)

attorneys' fees.  Plaintiff and all other New York employees who opt into this action are also

entitled to damages for unlawful wage deductions as well as liquidated damages under the New

York Labor Law ("NYLL").

### JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29

U.S.C. § 216(b).

3.     Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims set forth herein occurred in this District.

## PARTIES

4.     Plaintiff Scott Kimble is an adult individual residing in the State of New York. He was formerly employed by Northeastern Appraisal Associates, Inc. ("Northeastern") as a Staff Appraiser. Kimble began his employment with Opteon Appraisal, Inc. ("Opteon") in July 2022 when Opteon acquired Northeastern, and has worked out of his home in Amherst, New York until the present.

5.     Defendant Opteon is a Delaware corporation registered as a foreign business entity in New York with its principal place of business in Scottsdale, Arizona.

6.     Upon information and belief, Opteon employs over 200 full-time Staff Appraisers who work from their homes throughout the United States.

## FLSA COLLECTIVE ACTION ALLEGATIONS

7.     Plaintiff brings this action on behalf of himself and other employees similarly situated as authorized under the FLSA, 29 U.S.C. § 216(b). The employees similarly situated are:

**Collective Class:** All persons who are or have been employed by Defendant as Staff Appraisers, including employees with the job title "Staff Appraiser" and any other employee performing the same or similar duties for Defendant within the United States at any time from three years prior to the filing of this Complaint to the final disposition of this case.

8.     Defendant employs Staff Appraisers to evaluate residential properties.

9.      Staff Appraisers are not required to have a college degree, exercise little discretion, receive their assignments from their home office manager, and produce appraisals pursuant to Defendant's standardized appraisal process.

10.     Staff Appraisers are certified pursuant to state licensing requirements and perform their work pursuant to professional industry standards.  Defendant rewards consistency, accuracy and efficiency in each staff appraiser's work. Staff Appraisers are required to attend mandatory trainings and monthly meetings held by Defendant.

11.     The primary duties of Defendant's Staff Appraisers are: scheduling appointments with homeowners or realtors; conducting physical inspections and taking photos of residential properties, conducting on-line or municipal data searches; researching comparable local sales; and uploading completed appraisal reports to Defendant's website.

12.     Defendant often assigns Staff Appraisers to complete a number of Appraisals per week which necessitates the Staff Appraisers to work in excess of forty hours in a work week.

13.     Defendant failed and continues to fail to pay its Staff Appraisers an overtime premium for those hours they work in excess of forty in a work week. Instead, as part of Opteon's business model, it pays Staff Appraisers a fixed percentage of the fee received by Opteon for each report.

14.     Defendant's business model is centered on selling appraisal reports to mortgage lenders.

15.     Staff Appraisers' completion of appraisal reports satisfied Defendant's core productive service.

16.     Staff Appraisers do not fall within the administrative exemption to the overtime requirements of the FLSA.

17.    Staff Appraisers do not make sales.

18.    Staff Appraisers must travel to the site of an appraisal and physically inspect and document the property in order to generate their appraisal reports.

19.    Staff Appraisers' job description requires that they be "[p]hysically capable of viewing the subject property in person," and be able to lift at least twenty pounds.

20.    Moreover, Staff Appraisers' primary duties are not directly related to the management or general business operations of Opteon or Opteon's customers. Instead, Staff Appraisers' services are the main product offered by the company.

21.    Finally, Staff Appraisers do not exercise discretion and independent judgment with respect to matters of significance in the course of their duties, since they perform their duties in strict adherence to very detailed company and industry requirements.

22.    As part of the onboarding process, Staff Appraisers are given an "Appraisal Playbook" (the "Playbook") which explicitly sets out each phase of the appraisal process with a detailed explanation of the tasks involved in each step.

23.    One of the Playbook's 35 pages of instructions sets out nine steps and 27 sub-steps minutely detailing Staff Appraisers' duties from start to finish of the process of generating an appraisal report, as follows:

| Process | Required Tasks | Milestones |
|---------|----------------|------------|
| 1. Order Verification | a)  Complete Order Verification Checklist:<br>  1.  Review order details.<br>  2.  Review engagement letter and lender requirements.<br>  3.  Review order instructions and notes.<br>  4.  Check for required documentation.<br>  5.  Check for contact information.<br>b)  Comment in JaroDesk on order verification complete or delay communication. | Within 4 hours of order assignment |
| 2. First Contact | a)  Make first contact attempt.<br>b)  Document contact attempt in JaroDesk if unsuccessful, or proceed to scheduling. | |
| 3. Follow Up & Scheduling | a)  Follow up contact attempts.<br>b)  Schedule inspection.<br>c)  Homeowner/Agent interview.<br>d)  Communicate updates in JaroDesk. | Within 24 hours of order assignment |
| 4. Report Preparation | a)  File creation and set-up.<br>b)  Subject research.<br>c)  Market research.<br>d)  Comparable research and selection. | Before inspection |
| 5. Fieldwork | a)  Conduct property inspection.<br>b)  Photograph comparable properties. | Within 24 hours of scheduling |
| 6. Reconciliation | a)  Reconcile appraisal data and report value.<br>b)  Add in supporting commentary.<br>c)  Complete value variance review (if applicable). | Within 24 hours of inspection |
| 8. Delivery | a)  Complete final review checklist.<br>b)  Verify signature.<br>c)  Export and submit to JaroDesk. | |
| 9. Revisions | a)  Review and address any internal revision requests from QC.<br>b)  Review and address and external revision or ROV requests. | Internal Revisions within 4 hours of receipt<br>External Revisions within 6 hours of receipt |

24.     In another section of the Playbook, a "Resolution Guide" sets out numerous potential issues a Staff Appraiser may encounter and strictly prescribes a response to each of them. For example, one issue posited is a situation where a Staff Appraiser "Ha[s] not received new construction comparable sales information from the Sales Office." In this scenario, Staff Appraisers are instructed to "Explain that you haven't received comparable sales data from the [sic] and advise if it will result in any delay in inspection or report delivery," and are further instructed that "If there is sufficient comparable data on the MLS and no additional comparable sales are needed from Sales Office, proceed with order."

25.     Plaintiff Kimble brings this FLSA collective action on behalf of himself and all other persons who were, are, or will be employed by Defendant nationwide as Staff Appraisers, or

any other employees employed by Defendant nationwide whose primary duties include inspecting residential properties and completing residential property Appraisals for single or multiple family residences, at any time within the three years prior to the filing date of this action through the date of final disposition, and who were, are, or will be permitted or suffered to work in excess of forty hours per week without receiving overtime pay as required by federal law ("Nationwide FLSA Collective Plaintiffs").

26.     The named Plaintiff and the Nationwide FLSA Collective Plaintiffs are similarly situated in that they have, had, or will have, at all relevant times, substantially similar job requirements, duties, and pay provisions, and were subject to Defendant's practice, policy or plan of unlawfully failing to pay them overtime for all hours worked in excess of forty in a work week.

27.     Pursuant to their job duties, Plaintiff and the Nationwide FLSA Collective Plaintiffs are required to monitor Opteon's work assignment system during the day and immediately respond when they receive an assignment.

28.     Moreover, as of January 17, 2023, Opteon implemented a six-day work week, requiring Staff Appraisers to meet Saturday deadlines. This has significantly increased the overtime hours per week worked by Plaintiff and other Staff Appraisers.

29.     At a company meeting on or about March 7, 2023, Opteon's Chief Appraiser advised the Staff Appraisers in attendance that they should be operating on a schedule of ten-hour workdays, six days per week, resulting in a sixty-hour work week.

30.     On Friday, March 24, 2023, Plaintiff's Manager emailed the team stating it was a company expectation that all staff appraisers turn in their reports the day after an inspection takes place. While the Team Lead noted there may be exceptions to this turnaround time when issues such as technical problems or extreme weather arise, no exception is made if completing a report

will require an appraiser to work more than 40 hours in a week. Upon information and belief, this is a requirement of all Staff Appraisers.

31.    In order to receive assignments and complete them in the required amount of time, Opteon requires Staff Appraisers, including Plaintiff, to be available and responsive at all hours from Monday through Saturday each week.

32.    Plaintiff and other Staff Appraisers have also been required to take trainings related to Opteon's business, such as "Ethics for Employees" and "New York Sexual Harassment Prevention," which are entirely unpaid.

33.    Plaintiff and other Staff Appraisers also have been required to sit in on Opteon's monthly company meetings, yet are not compensated for this time.

34.    Plaintiff's contract states that he is a non-exempt employee. However, Opteon does not pay him or, upon information and belief, any other Staff Appraisers overtime when they work more than 40 hours per week.

35.    Upon information and belief, Defendant keeps no records regarding Plaintiff's work hours or the work hours of other Staff Appraisers.

**INDIVIDUAL PLAINTIFF SCOTT KIMBLE ALLEGATIONS**

36.    Named Plaintiff Kimble started working for Defendant Opteon in July 2022 as a Staff Appraiser in New York.

37.    Since beginning work at Opteon, Plaintiff has routinely worked more than 40 hours per week.

38.    Plaintiff has never agreed to work sixty hours per week at Opteon, and his contract does not specify that his pay is intended to cover a specific number of hours per week.

39.    According to Plaintiff's contract, he is to be paid a commission of 55% of the value of each appraisal fee Opteon receives.

40.    The standard fee received by Opteon is $400, making Plaintiff's earned commission $220.

41.    However, Opteon charges all Staff Appraisers an $11 "innovation fee" which is deducted from each commission. Opteon keeps that fee, which is not for the benefit of the appraisers.

42.    Further, according to Plaintiff's contract, his commission for a given appraisal is not "earned" until the client/customer is issued an invoice for the applicable job.

43.    On a typical workday, Plaintiff starts working at approximately 7:00am.

44.    To begin work, Plaintiff logs into Opteon's website and opens the file of the relevant case or cases.

45.    First, Plaintiff reviews the "pre-load" information provided about the property, which takes approximately 15-20 minutes.

46.    If the "pre-load" contains incorrect information, which it nearly always does, Plaintiff has to log into an application called Jaro Boost where he enters the file number, chooses a description of the problem from a drop-down menu, and describes what is missing or incorrect in the pre-load information. This can take Plaintiff 15 minutes or more depending on how much incorrect or missing information there is.

47.    After entering any issues into Jaro Boost, Plaintiff finishes reviewing the pre-load data, then pulls all public records data for the relevant property, organizing it into an electronic folder.

48.     Plaintiff is also required to review an "engagement letter" for each property which sets out in detail all items required by the lender to be included in the appraisal report. Engagement letters average eight to ten single-spaced pages. Reviewing these engagement letters takes approximately 30 minutes per letter, as the Staff Appraiser is required to carefully ensure that all lender requirements are complied with during the appraisal process.

49.     If Plaintiff will be visiting more than one property that day, which is the case about half the time, he repeats this process for the second property.

50.     Once the necessary information is collected, Plaintiff drives to the relevant property to take measurements. Plaintiff may be required to travel anywhere from ten minutes to an hour to reach the property.

51.     Upon arriving at the property, Plaintiff takes all necessary inside and outside measurements, which takes an average of approximately 45 minutes.

52.     When a property is being purchased through a mortgage covered by the Fair Housing Act, Plaintiff must comply with additional documentation requirements, such as operating the doors and windows in every room, sampling electrical outlet functionality, and checking the water pressure.

53.     If Plaintiff is evaluating a second property, he will drive from the first property to the second property, which takes up to another 45 minutes, then repeats the entire process at the second property.

54.     Some of Plaintiff's clients also require original photos of comparable residences, so Plaintiff also has to drive to the comparable residences to take the photos.

55.     In addition, for rural properties, Staff Appraisers are required to separately value the acreage included in the property as distinguished from the buildings present on the property. This approximately doubles the time it takes to complete an appraisal of a given property.

56.     Once Plaintiff is finished physically inspecting and documenting the relevant properties, he returns to his home office, where he puts together a sketch of each property that takes about 20 minutes per sketch.

57.     Plaintiff then begins the necessary forms for each property, which requires him to research market data and fulfill all lender documentation requirements.

58.     This market data research takes Plaintiff approximately two hours for each property being appraised.

59.     Plaintiff is also required to prepare an inspection report for each property, which takes him about an hour per report.

60.     Plaintiff is further required to research comparable properties, and often must perform an analysis called "bracketing" which requires him to research pricing for properties that are similar but different from the property being appraised in a single respect, for instance a property with the same acreage and bedrooms but one less or one more bathroom. This research takes one to two hours per property.

61.     For certain properties, Plaintiff is also required to respond to information correction requests and value disputes. While correction requests can normally be addressed in approximately five to fifteen minutes, some value disputes can take up to an hour to respond to. In total, Plaintiff spends approximately two hours per week dealing with correction requests and value disputes. Time spent addressing value disputes is not credited to a given project.

62.     In addition, Opteon has recently implemented additional requirements regarding the information Staff Appraisers are required to upload to the company's system, which can add up to an additional hour per assignment.

63.     Some assignments take Plaintiff a day or more to complete due to the myriad requirements that can accompany any given appraisal subject.

64.     As an example, on May 24, 2023, Plaintiff had to inspect two properties and was working from approximately 7:00am to 8:00pm.

65.     In the work week of May 22-27, 2023, Plaintiff had two inspections on Monday May 22, two inspections on Tuesday May 23, two inspections on Wednesday May 24 with two reports due the same day, and two inspections each on Thursday May 25 and Friday May 26.

66.     To finish all the work he was assigned in the week of May 22-27, 2023, Plaintiff was required to work over 60 hours and was not paid any overtime.

67.     On average, Plaintiff is required to work approximately 60 hours per week.

68.     Plaintiff's paycheck does not indicate the number of hours he works in each pay period, nor how much he is being paid for each individual assignment.

## **FIRST CAUSE OF ACTION**

### **(Failure To Pay Overtime Compensation in Violation of FLSA)**

69.     The Named Plaintiff, on behalf of himself and all Nationwide FLSA Collective Plaintiffs, realleges and incorporates all prior paragraphs as if they were set forth again herein.

70.     At all relevant times, Defendant has been and continues to be, an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce", within the meaning of the FLSA, 29 U.S.C. § 203.

71.     At all relevant times, Defendant has employed employees, including Named Plaintiffs and each of the collective Nationwide FLSA Collective Plaintiffs.

72.     At all relevant times, Defendant has had gross operating revenues in excess of $500,000.

73.     Attached hereto as Exhibit A is a consent to sue signed by the Named Plaintiff in this action pursuant to § 16(b) of the FLSA, 29 U.S.C. §§ 216(b) and 256.

74.     The FLSA requires each covered employer, such as Defendant, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a work week.

75.     Plaintiff and the Nationwide FLSA Collective Plaintiffs are entitled to be paid overtime compensation for all overtime hours worked.

76.     At all relevant times, Defendant, pursuant to its policies and practices, failed and refused to pay overtime premiums to Plaintiff and the Nationwide FLSA Collective Plaintiffs for their hours worked in excess of forty hours per week, even though they do not qualify for any FLSA exemption, based upon their duties as performed.

77.     By failing to compensate Named Plaintiff and the Nationwide FLSA Collective Plaintiffs at a rate not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, Defendant has violated and continues to violate the FLSA, 29 U.S.C. §§ 201, *et seq.,* including 29 U.S.C. § 207(a)(1) and §215(a).

78.     By failing to record and/or preserve records of hours worked by the Named Plaintiffs and the FLSA Collective Plaintiffs, Defendant has failed to make, keep and preserve records with respect to each of its employees sufficient to determine their wages, hours and other

conditions and practice of employment, in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.,*
including 29 U.S.C. § 211(c) and § 215(a).

79.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA
within the meaning of 29 U.S.C. § 255(a).

80.    The Named Plaintiff, on behalf of himself and the Nationwide FLSA Collective
Plaintiffs, seeks damages in the amount of his respective unpaid overtime compensation, liquidated
damages as provided by the FLSA, 29 U.S.C. § 216(b), recovery of attorneys' fees and the costs
of this action as provided by the FLSA, 29 U.S.C. § 216(b), interest and such other legal and
equitable relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION

### (Failure to Pay Overtime Compensation in Violation of the NYLL)

81.    Plaintiff realleges and incorporates by reference the above paragraphs as if they
were set forth again herein.

82.    At all times relevant to this action, Plaintiff was employed by Defendant within the
meaning of New York Labor Law Article 6 § 190(2).

83.    Defendant willfully violated the rights of Plaintiff by failing to pay him overtime
compensation at rates not less than one and one-half times the regular rate of pay for each hour
worked in excess of forty hours in a workweek in violation of the New York Minimum Wage Act
(New York Labor Law Article 12) and in its regulations, N.Y.C.R.R. § 142-2.2.

84.    Due to Defendant's New York Labor Law violations, Plaintiff is entitled to recover
from Defendant his unpaid overtime premium wages, reasonable attorneys' fees and costs of the
action, pre-judgment and post-judgment interest, liquidated damages, and other compensatory and

equitable relief pursuant to New York Labor Law Article 6 § 190 *et seq.*, and Article 19, § 650 *et seq.*

### THIRD CAUSE OF ACTION
### Unlawful Deductions from Wages Under NYLL § 193

85.     Plaintiff alleges and incorporates by reference the allegations contained in the preceding paragraphs.

86.     Defendant violated the rights of Plaintiff by unlawfully deducting an "innovation fee" from their wages in violation of the NYLL.  That deduction was not for Plaintiff's benefit.

87.     At all times relevant to this action, Plaintiff has been employed by Defendant within the meaning of the NYLL.

88.     As a result of Defendant's violation of the NYLL, Plaintiff is entitled to recover his unlawfully withheld wages as well as liquidated damages, interest, and attorney's fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated who opt in to this action, prays for the following relief:

a.  That, at the earliest possible time, Plaintiff through his counsel be permitted to give notice of this collective action, or that the Court issue such notice of this collective action, or that the Court issue such notice to all persons who are presently, or have at any time during the three years immediately preceding the filing of this suit, up through and including the date of the Court's issuance of court-supervised notice, been employed by Defendant. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper hourly compensation and overtime wages;

b.  Certification of this case as a collective action pursuant to 29 U.S.C. § 216(b);

14

c.  Unpaid wages, back pay, front pay, penalties, attorneys' fees, costs, and interest pursuant to 29 U.S.C. § 201 *et seq.* and the NYLL § 190 *et seq.;*

d.  An additional and equal amount in unpaid wages as liquidated damages pursuant to 29 U.S.C. § 201 *et seq.;*

e.  Statutory damages pursuant to NYLL §§ 193, 198;

f.  Issuance of a declaratory judgment that the practices complained of herein are unlawful under the FLSA and NYLL, and a permanent injunction against Defendant's continued engagement in such practices; and

g.  Such other and further relief as this Court finds just and proper.

Dated: New York, New York
        July 14, 2023

**MENKEN SIMPSON & ROZGER LLP**

By:  /s/Jason Rozger
        Jason Rozger
        Brenna Rabinowitz
        Raya Saksouk
        80 Pine St., 33rd Fl.
        New York, NY 10005
        (212) 509-1616
        jrozger@nyemployeelaw.com

**BRYAN SCHWARTZ LAW, P.C.**

By:  /s/Bryan Schwartz
        Bryan Schwartz (*pro hac vice* application forthcoming)
        Renato Flores (*pro hac vice* application forthcoming)
        180 Grand Avenue, Suite 1380
        Oakland, CA 94612
        (510) 444-9300
        bryan@bryanschwartzlaw.com

*Attorneys for Plaintiff and FLSA Proposed Collective*